FILED          RECEIVED
ENTERED        SERVED ON

2007 AUG 29  A  9 55

CLERK US DISTRICT COURT
DISTRICT OF NEVADA

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

In re:

USA COMMERCIAL MORTGAGE CO.;
USA CAPITAL REALTY ADVISORS,
LLC; USA CAPITAL DIVERSIFIED
TRUST DEED FUND, LLC; USA
CAPITAL FIRST TRUST DEED FUND,
LLC; and USA SECURITIES, LLC,

        Debtors.

THE LENDERS PROTECTION GROUP;
CHARLES B. ANDERSON TRUST;
RITA P. ANDERSON TRUST; BALTES
CO.; KEHL FAMILY MEMBERS; and
MOJAVE CANYON, INC.,

        Appellants,

v.

USA COMMERCIAL MORTGAGE CO.,
et al.,

        Appellees.

DEBT ACQUISITION COMPANY OF
AMERICA V,

        Appellant,

v.

USA COMMERCIAL MORTGAGE CO.,
et al.,

        Appellees.

2:07-CV-00072-RCJ-GWF
2:07-CV-00160-RCJ-GWF

Case No. BK-S-06-10725 LBR
Case No. BK-S-06-10726 LBR
Case No. BK-S-06-10727 LBR
Case No. BK-S-06-10728 LBR
Case No. BK-S-06-10729 LBR

Chapter 11

Jointly Administered Under
Case No. BK-S-06-10725 LBR

OPINION

This matter comes before the Court on Appellee-Debtors' USA Commercial Mortgage Company ("USACM") and Debt Acquisition Company of American's ("DACA") Motions to Dismiss as Moot the Appeal of Appellants Lenders Protection Group ("Lenders") (No. 2:07-CV-0072-RCJ-GWF, #76; No. 2:07-CV-0160-RCJ-GWF, #23), and Second Motions to Dismiss the Appeal as Moot (No. 2:07-CV-0072-RCJ-GWF, #79; No. 2:07-CV-0160-RCJ-GWF, #26). Additionally, the Court now considers the parties' briefs on the merits of the appeal (No. 2:07-CV-0072-RCJ-GWF, #47; No. 2:07-CV-0160-RCJ-GWF, #45). The Court held a hearing on June 27, 2007, to hear argument on the pending motions, and has considered such arguments, along with the relevant pleadings on record, in entering the following Order.

## BACKGROUND

This matter arises out of appeals from a Bankruptcy Court order confirming a plan of reorganization. The Debtors are five related entities which were involved in the sale of fractional interests in loans and the servicing those loans. Debtor USA Commercial Mortgage Company ("USACM") was a Nevada corporation in the business of underwriting, originating, brokering, funding, and servicing commercial loans primarily secured by commercial and residential developments. (Statement of Record ["SOR," 2:07-CV-00072-RCJ-GWF, Doc. #41], Ex. 1 at 23.) USACM solicited individual investors to purchase fractional interests in loans. (*Id.* at 24.) As of the Petition Date, approximately 3,600 investors were named as lenders on one or more of USACM's serviced loans. (*Id.*) These lenders have been referred to as "Direct Lenders" throughout the bankruptcy proceedings. Among the Direct Lenders are Debtors USA Capital Diversified Trust Deed Fund, LLC ("DTDF") and USA Capital First Trust Deed Fund, LLC ("FTDF"). (*Id.* at 24-25.) DTDF and FTDF permitted investment in a fund that in turn would invest in USACM loans, as opposed to lenders directly investing in the loans. (*Id.* at 25-26.) Debtor USA Securities, LLC was a registered broker-dealer with the primary business of selling membership interests in FTDF. (*Id.* at 27.) Debtor USA Capital Realty Advisors LLC was the manager of DTDF and FTDF. (*Id.*)

Prior to the Petition Date, USACM made monthly interest payments to Direct Lenders regardless of whether the borrowers on the particular loan had paid USACM. (*Id.* at 28.) The parties have referred to these payments on non-performing loans as "Prepaid Interest." (*Id.*) USACM used other sources of funds to cover the Prepaid Interest payments, such as principal paid on loans from other borrowers, deferred loan fees payable to USACM, and transfers from DTDF. (*Id.* at 28, 61.) The sources of funds from which USACM made Prepaid Interest payments were commingled in USACM's collection account along with payments USACM received from borrowers. (*Id.* at 61.) As of the Petition Date, USACM had paid approximately $39.5 million in Prepaid Interest to the Direct Lenders. (*Id.* at 28.) By April 2006, USACM did not have sufficient funds to make monthly payments to Direct Lenders and the Securities and Exchange Commission had initiated an investigation, leading Debtors to file for bankruptcy protection. (*Id.*)

Following the bankruptcy filing, the Board of Directors appointed Thomas J. Allison ("Allison") as the Chief Restructuring Officer for all five Debtors. (*Id.*) Allison terminated the employment of USACM insiders and investigated the Debtors' records. (*Id.* at 28-29.) Allison discovered a variety of improprieties, including the payment of Prepaid Interest, the collection of principal payments which USACM did not distribute to the appropriate Direct Lenders (referred to as "Unremitted Principle"), and other irregularities. (*Id.*) Allison also discovered USACM had not always charged the Direct Lenders for loan servicing fees due under the Loan Servicing Agreements ("LSAs") between USACM and the Direct Lenders. (*Id.* at 34-35.)

In May 2006, USACM filed a motion requesting permission to hold funds collected from borrowers until Allison could determine the proper recipients and holdback amounts. (*Id.* at 31.) The Bankruptcy Court granted the motion allowing USACM to hold the funds temporarily. (*Id.*) The Bankruptcy Court modified this order in October 2006 setting forth the procedures for future monthly distributions less certain holdbacks. (*Id.* at 32.)

The Debtors filed the Third Amended Joint Chapter 11 Plan of Reorganization ("Plan") on November 15, 2006. (SOR, Ex. 3.) The Plan has two features which are the focus of the present

3

1  appeals, the handling of Prepaid Interest and the sale of USACM's LSAs.

2         With respect to Prepaid Interest, the Plan sets forth a "compromise" between USACM and

3  the Direct Lenders. (*Id.* at 51-53.) As part of the compromise, USACM releases all claims against

4  the Direct Lenders for surcharge, recharacterization of loans, and collection of service fees accrued

5  pre-petition that remain unpaid. (*Id.* at 51-52.) In exchange for these releases, the Direct Lenders'

6  claims for Prepaid Interest and Holdbacks which USACM collected but did not distribute as of the

7  Plan's effective date would become property of the Debtors' estate upon confirmation. (*Id.* at 52.)

8  The Debtors would continue to net Prepaid Interest after the effective date from sums collected

9  from borrowers until the Debtors' estate recovered an amount equal to the particular Direct

10 Lender's Prepaid Interest. (*Id.*)

11         The Plan tolled the statute of limitations on causes of action to recover Prepaid Interest for

12 two years to allow the Debtors to collect Prepaid Interest through this netting process rather than

13 suing each Direct Lender, in the hopes that within two years, the Debtors would recover all or

14 substantially all Prepaid Interest through payments received from borrowers. (*Id.* at 52-53.) After

15 two years, the Debtors could pursue any remaining unrecovered Prepaid Interest through litigation.

16 (*Id.*) The Plan also provided for a two percent Holdback from which USACM would retain its

17 contractual servicing fees under the LSAs and would use a percentage of the Holdback to pay up to

18 $605,000 in professional expenses. (*Id.* at 53.) Although the Plan termed these arrangements a

19 compromise, the Plan made clear that "all Direct Lenders will be bound to the compromise

20 provisions set forth herein, regardless of whether they vote to accept or reject the Plan, or [their

21 class of creditors] votes to accept or reject the Plan . . . ." (*Id.* at 51.)

22         With respect to the LSAs, the Plan contemplates the auction and sale of certain FTDF

23 interests in loans plus USACM's rights to service loans pursuant to the LSAs. (*Id.* at 47.) The

24 Plan provides that the Asset Purchaser[1] would take the LSAs "free and clear of all liens, Claims,

25

26     [1]  Through an auction process, the successful bidder was Compass Partners, which agreed to pay
    approximately $67 million for certain assets as set forth in the Plan and the Asset Purchase Agreement.

1  encumbrances, rights of third parties and interests." (*Id.* at 47.) The Plan treats the LSAs as non-
2  executory contracts, therefore the requirements of 11 U.S.C. § 365 regarding the steps a bankruptcy
3  trustee must take to reject or assume and cure executory contracts would not apply. (*Id.* at 22, 45,
4  47, 57-58, 60-62, 75-76, Ex. A.)

5         On December 11, 2006, Appellant Lenders Protection Group ("LPG"), which consists of a
6  group of Direct Lenders, timely filed an objection to confirmation of the Plan as it applied to
7  USACM. (Opp'n to Appellee-Debtors' Emergency Mot. to Dismiss Appeal [2:07-CV-00072-RCJ-
8  GWF, Doc. #44], Ex. A.) LPG raised eight objections to confirmation, asserting the Plan attempts
9  to take lenders' property in the form of Prepaid Interest through confirmation rather than through
10 an adversary proceeding in violation of Federal Rule of Bankruptcy Procedure 7001; the
11 "compromise" is non-consensual; the Plan attempts to foreclose lenders' Unremitted Principal
12 setoff rights without due process; the Plan improperly classifies creditor classes by failing to create
13 a class of lenders who had received Prepaid Interest and had Unremitted Principal setoff claims; the
14 Plan attempts to assign executory contracts without assumption and assignment; the voting
15 process' integrity was compromised; the Plan attempts to recover service fees exceeding the
16 amounts set forth in the LSAs; and the Plan fails to pursue valuable assets in the form of various
17 causes of action. (*Id.*)

18        Appellants Charles B. Anderson Trust, Rita P. Anderson Trust, Baltes Company, Kehl
19 Family Members and Mojave Canyon, Inc. ("JV Direct Lenders") filed an amended joinder in
20 LPG's objections on December 14, 2006. (*Id.*, Ex. B.) JV Direct Lenders requested the Direct
21 Lenders' setoff rights be preserved and stated they did not object to selling the LSAs to the Asset
22 Purchaser "so long as it is clear that there is no assumption and assignment that would suggest
23 there has been a cure of the USACM defaults." (*Id.* at 2.)

24        Appellant Debt Acquisition Company of America V ("DACA"), a company that purchased

25
26 (Decl. of Annette W. Jarvis in Support of Joint Emergency Mot. to Quash Stay Pending Appeal [2:07-
   CV-00072-RCJ-GWF, Doc. #2].)

Direct Lenders' interests in loans serviced by USACM and Unremitted Principal claims, also filed
objections to Plan confirmation. (Appellee-Debtors' Emergency Mot. to Dismiss Appeal & Mem.
of Law in Support Thereof [2:07-CV-00160-RCJ-GWF, Doc. #2], Exs. 3 & 9.) Specifically,
DACA objected that the LSAs are executory contracts which the Debtors either had to assume and
cure or the contracts were rejected under the Plan. (*Id.*, Ex. 9) DACA argued that if the Debtors
assumed the LSAs, the Debtors were required to cure prior defaults by paying in full Unremitted
Principal. (*Id.*) DACA further argued that if the LSAs were rejected under the Plan, then the Asset
Purchaser would take the assignment of the LSAs subject to the Direct Lenders' rights arising from
USACM's breaches of contract. (*Id.*) DACA also objected to the non-consensual "compromise"
of its contractual rights in the LSAs. (*Id.*)

DACA supported its objections with the declaration of Howard Justus ("Justus"), DACA's
President. (*Id.*, Ex. 3.) Justus averred that DACA purchased fifty-two Direct Lenders' interests in
USACM-serviced loans totaling approximately $4.2 million in principal. (*Id.*) Justus also stated
DACA purchased fifteen Unremitted Principal claims totaling $399,222.50. (*Id.*) Finally, Justus
noted that DACA does not agree to the "compromise" in the Plan. (*Id.*) Attached to the Justus
declaration is a listing of the Direct Lender interests and Unremitted Principal claims DACA
purchased. (*Id.*, Exs. A & B.)

At the December 19, 2006 hearing on confirmation, LPG, JV Direct Lenders, and DACA
orally argued in support of their objections. (SOR, Ex. 17, Attach. 1.) The Bankruptcy Court
overruled these objections, approved the Plan, and entered findings of facts and conclusions of law
and a confirmation order on January 8, 2007. (SOR, Exs. 15 & 16.)

The LPG filed a notice of appeal on January 16, 2007. (Opp'n to Appellee-Debtors'
Emergency Mot. to Dismiss Appeal, Ex. K.) The Notice of Appeal identified the appellants as
"The Lenders Protection Group, a group of investors/lenders in USA Commercial Mortgage
Company ('USACM'), as identified on the Statement of The Law Offices of Alan R. Smith
Pursuant to Bankruptcy Rule 2019 filed herein on December 6, 2006, and as supplemented

1  thereafter . . . ." (*Id.*; *see also* Exs. E & F for LPG's Rule 2019 statements.) On January 17, 2007,

2  Appellants LPG and the JV Direct Lenders filed an Amended Notice of Appeal which identified

3  LPG in the same manner but added as Appellants the JV Direct Lenders, identified as "Charles B.

4  Anderson Trust, Rita P. Anderson Trust, Baltes Company, Kehl Family Members and Mojave

5  Canyon, Inc. . . . ." (Opp'n to Appellee-Debtors' Emergency Mot. to Dismiss Appeal, Ex. L; *see*

6  *also* Exs. G-I for JV Direct Lenders' Rule 2019 statements.) Appellant DACA filed a Notice of

7  Appeal on January 17, 2007. (Notice of Appeal [2:07-CV-00160-RCJ-GWF, Doc. #3].)

8    The appeals initially went to the United States Bankruptcy Panel of the Ninth Circuit

9  ("BAP"),[2] but Appellees opted to have the appeals heard in this Court. (Certificate of Bankr.

10  Record on Appeal [2:07-CV-00072-RCJ-GWF, Doc. #24]; Notice of Transfer of Appeal to Dist.

11  Ct. [2:07-CV-00160-RCJ-GWF, Doc. #1].) After the BAP transferred the appeals to this Court,

12  Appellants LPG and JV Direct Lenders filed a Certificate of Interested Parties which identified by

13  name parties represented by LPG and JV Direct Lenders. (Opp'n to Appellee-Debtors' Emergency

14  Mot. to Dismiss Appeal, Ex. M.)

15

16    On February 16, 2007, the Debtors consummated sale of the FTDF and USACM assets,

17  including loan servicing rights under the LSAs, to Compass Partners ("Compass Sale"). The

18  Compass Sale was expressly conditioned on being approved by the Bankruptcy Court as part of the

19  Plan. The Confirmation Order authorized the Debtors to complete the Compass Asset Purchase

20  _____

21   [2] The BAP granted Appellants' motion for a stay of the Confirmation Order pending appeal.
   (Joint Emergency Mot. to Quash Stay Pending Appeal, Vacate Temporary Stay Order & Refer Stay

22  Mot. to the Bankr. Ct. [2:07-CV-00072-RCJ-GWF, Doc. #2], Ex. 1.) Upon transfer to this Court, the
   LPG and JV Direct Lenders' appeal originally was assigned to the Honorable Roger L. Hunt, who

23  reassigned the case to the undersigned on January 19, 2007 for joint administration with the DACA

24  appeal and another appeal filed by the Debtors' former insiders. (Min. Order [2:07-CV-00072-RCJ-
   GWF, Doc. #7]; *see also* 2:07-CV-00138-RCJ-GWF.) On Appellees' motion, the Court vacated the

25  BAP's order granting a stay pending appeal. (Mins. of Proceedings [2:07-CV-00072-RJC-GWF, Doc.
   #20]; Order Granting Joint Emergency Mot. to Quash Stay Pending Appeal, Vacate Temporary Stay

26  Order & Refer Stay Mot. to the Bankr. Ct. [2:07-CV-00072-RCJ-GWF, Doc. #23].)

1    Agreement and provided that the transfer vested Compass with all rights "free and clear of all

2    Claims and Interests of any kind or nature." Under the Sale, Compass continues netting of the

3    additional Holdback Funds for two years as successor loan servicer. The Confirmation Order

4    provided that as a good faith purchaser, Compass is entitled to the protections of Section 363(m) of

5    the Bankruptcy Code, meaning that reversal on appeal would not affect the validity of the Sale.

6    With the Compass Sale in place, the Plan became effective on March 12, 2007.

7        Presently, Debtors move to dismiss the appeal as moot. They claim that absent a stay, the

8    doctrine of equitable mootness and Section 363(m) protect the Compass Sale from attack on

9    appeal. Debtors also note that the Plan has been substantially consummated and that piecemeal

10    modification on appeal would undermine the Plan compromises. The parties also now discuss the

11    substantive merits of the appeal.

12                                          **DISCUSSION**

13    **I.      Mootness**

14        Appellants LPG and DACA raise numerous issues on appeal related to the Plan and

15    Compass Sale provisions. LPG's appeal raises two general issues: (1) the Plan's use of non-

16    consensual compromise provisions to recoup LPG's property in a two-year process ("Due Process

17    Issues"), and (2) the assignment of the LSAs without first curing defaults and assuring future

18    performance ("Executory Contract Issues"). DACA's appeal likewise raises two general categories

19    of issues: (1) invalidation of the "Comfort Provisions" in the Compass Sale, and (2) the Executory

20    Contract Issues. Debtors contend that the appeal must be dismissed as moot. They assert that

21    Section 363(m) of the Bankruptcy Code moots appeal of any issues related to the Compass Sale,

22    and the doctrine of equitable mootness forbids appeal of the substantive Plan provisions because

23    the Plan has been substantially consummated.

24        **A.      Mootness Doctrine in Bankruptcy Appeals**

25        The justiciability doctrine of mootness has special relevance in the context of bankruptcy

26    appeals. Court have "consistently affirmed" the importance of mootness doctrine in bankruptcy to

                                               8

1  ensure finality of unstayed bankruptcy orders and protect the rights of third parties who innocently

2  rely upon such orders. *Ewell v. Diebert*, 958 F.2d 276, 280 (9th Cir. 1992). Bankruptcy appeals

3  become moot in two ways. First, an appeal becomes constitutionally moot when the appellate

4  court cannot fashion effective relief. *Focus Media, Inc. v. Nat'l Broadcasting Co., Inc.*, 378 F.3d

5  916, 922 (9th Cir. 2004). The "classic example" of constitutional mootness in a bankruptcy appeal

6  "is a case in which the debtor has failed to seek a stay of foreclosure and the debtor's property has

7  been sold. The transfer to a third party precludes meaningful relief." *Baker & Drake, Inc. v.*

8  *Public Serv. Comm'n*, 35 F.3d 1348, 1351 (9th Cir. 1994). Constitutional mootness has now been

9  codified in Section 363(m) of the Bankruptcy Code. An appeal also may become "equitably moot"

10  when "a comprehensive change of circumstances may make it inequitable to consider the merits of

11  the appeal and prevents [a court] from fashioning effective relief." *Ederel Sport v. Gotcha Int'l*

12  *L.P.*, 311 B.R. 250, 254 (9th Cir. BAP 2004). Debtors seek dismissal on both mootness grounds.

13        **B.   Section 363(m) Mootness and the Compass Sale**

14        First, Debtors contend that Section 363(m) of the Bankruptcy Code renders moot

15  Appellants' appeal of the Compass Sale provisions. Section 363(m) provides that an appeal of a

16  sale of property to a good faith purchaser is moot if the appellant failed to obtain a stay:

17        The reversal or modification on appeal of an authorization under [Section 363(b)] of a sale
      or lease of property does not affect the validity of a sale or lease under authorization to an

18        entity that purchased or leased such property in good faith, whether or not such entity knew
      of the pendency of the appeal, unless such authorization and such sale or lease were stayed

19        pending appeal.

20  11 U.S.C. § 363(m).

21        **1.   Ninth Circuit Application of § 363(m)**

22        The Ninth Circuit consistently has applied Section 363(m) to dismiss appeals of a debtor's

23  sale of estate property. *See Paulman v. Gateway Venture Partners III (In re Filtercorp, Inc.)*, 163

24  F.3d 570, 576 (9th Cir. 1998) ("When a sale of assets is made to a good faith purchaser, it may not

25  be modified or set aside unless the sale was stayed pending appeal."). After reviewing the Circuit's

26  decisions applying Section 363(m), one Ninth Circuit decision noted, "[f]inality in bankruptcy has

become the dominant rationale in our decisions; the trend is towards an absolute rule that requires appellants to obtain a stay before appealing a sale of assets." *Onouli-Kona Land Co. v. Estate Richards (In re Onoili-Kona Land Co.)*, 846, F.2d 1170, 1172 (9th Cir. 1988).  Whether the appellate court "can fashion effective relief is immaterial," if the purchaser bought in good faith and a stay was not obtained. *In re Filtercorp*, 163 F.3d at 576.

Additionally, the "merits of the orders approving the sale are no longer in issue." *Dunlavey v. Arizona Title Ins. & Trust Co.*, 708 F.2d 1449, 1454 (9th Cir. 1983).  "At this junction, it matters not whether the [sale] authorization was correct or incorrect." *Anheuser-Busch, Inc. v. Miller*, 895 F.2d 845, 849 (1st Cir. 1990).  Section 363(m) encourages finality in bankruptcy sales, which serves the dual goals of enhancing the value of the estate property and protecting the rights of third-party purchasers reliant on sale orders. *See Onouli-Kona Land Co.*, 846 F.2d 1170, 1172 (9th Cir. 1988).

In this case, Appellants have failed to secure a stay pending appeal.  The Compass sale has closed and several non-parties to the appeal have altered their position in reliance on the Confirmation Order.  Additionally, the Confirmation Order specifically provides that Compass purchased the Assets from USACM and FTDF in good faith and that Compass is entitled to Section 363(m) protections: "[t]he transactions undertaken by the Asset Purchase Agreement are undertaken by the Asset Purchaser in good faith . . . . The Asset Purchaser is a purchaser in good faith of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code." (SOR, Ex. 3 at 47.)  In analyzing the good faith provision of Section 363(m), the Ninth Circuit has applied a clearly erroneous standard and only found bad faith when there is clear evidence of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Filtercorp*, 163 F.3d at 577 (quoting *Community Thrift & Loan v. Suchy (In re Suchy)*, 786 F.2d 900, 902 (9th Cir. 1985)).  Appellants provide no evidence that Compass or the Debtors acted in bad faith in consummating the Asset Purchase.  With no stay in place and the Bankruptcy Court's finding that Compass acted

as a good faith purchaser, the protections of Section 363(m) apply and the appeal cannot affect the validity of the sale.

### 2.    Validity of Sale Exception Not Recognized by the Ninth Circuit

Appellants concede that Section 363(m) applies to this appeal and that they cannot now obtain any relief on appeal affecting the validity of the Compass Sale. To avoid dismissal by mootness, Appellants narrow the scope of their appeal and attack only portions of the Compass Sale that they claim do not affect the Sale's validity. Appellants seek support for their position in cases outside the Ninth Circuit that recognize a limited exception to mootness in cases where the relief would not affect the ultimate validity of the asset sale. The Ninth Circuit has not recognized this minority exception in its case law interpreting Section 363(m). Furthermore, even if this exception applied, Appellants have not satisfied their burden in claiming it.

The Third, Eighth, and Tenth Circuits have recognized an exception to Section 363(m)'s blanket mootness rule in cases where the challenge would not affect the validity of the sale. The Third Circuit set forth its rule:

> [W]e have rejected a per se rule "mooting appeals absent a stay of the sale . . . at issue." . . . Instead, we require the satisfaction of two conditions before an appeal becomes moot under § 363(m): "(1) the underlying sale or lease must not have been stayed on appeal, and (2) reversing or modifying the authorization to sell would affect the validity of the sale or lease."

*Cinicola v. Scharffenberger*, 248 F.3d 110, 122 (3d Cir. 2001) (internal citation omitted). The Tenth Circuit stated its interpretation of Section 363(m) in similar terms, "By removing those remedies that would affect the validity of a sale to a good faith purchaser, § 363(m) moot some appeals, namely those cases where the only remedies available are those that affect the validity of the sale. . . . . However, where state law or the Bankruptcy Code provides remedies that do not affect the validity of the sale, § 363(m) does not moot the appeal." *In re Osborn*, 24 F.3d 1199, 1203 (10th Cir. 1994). The Eight Circuit clarified when an appeal affects the validity of a sale under this exception:

> We conclude a challenge to a related provision of an order authorizing the sale of the debtor's assets affects the validity of the sale when the related provision is integral to the sale of the estate's assets. A provision is integral if the provision is so closely linked to the agreement governing the sale that modifying or reversing the provision would adversely alter the parties' bargained for exchange.

*In re Trism, Inc.*, 328 F.3d 1003, 1006-07 (8th Cir. 2003).

Drawing upon these decisions, Appellants argue that the relief requested is narrowly drawn and would not alter the "parties' bargained for exchange" in this case. Appellants claim they only seek reversal or modification of the "Comfort Provisions." The Comfort Provisions refer to language allegedly added in the Confirmation Order, but not referred to in the Purchase Agreement, Disclosure Statement, or Plan itself. Appellants argue that these Provisions altered the Direct Lender's rights by stripping them of: (1) the right to change the servicing agent, (2) the right to direct the servicing agent to compromise with the borrower the amount of default interest in order to collect on the loan, and (3) termination rights over the LSAs. They seek to overturn only those portions of the Confirmation Order adding these provisions, and contend this relief would not affect the validity of the Compass Sale or the "parties bargained for exchange."

In citing other Circuit case law supporting an exception to Section 363(m)'s mootness bar, Appellants overlook the Ninth Circuit's firm approach to applying the statute. The Ninth Circuit has never recognized an analogous "validity of the sale" exception. Other courts have noted that the validity of sale exception is only recognized by a "minority of courts." *See In re Whistler Corp. of Mass.*, 243 B.R. 573, 574-75 (D. Mass. 2000). While the Ninth Circuit has not directly addressed the validity of sale exception, its case law demonstrates a consistent rejection of weakening the § 363(m) mootness standard. After reviewing the landscape of Ninth Circuit cases applying the statute, one panel noted, "[f]inality in bankruptcy has become the dominant rationale in our decisions; the trend is towards an absolute rule that requires appellants to obtain a stay before appealing a sale of assets." *Onouli- In re Onoili-Kona Land Co.*, 846, F.2d at 1172. In another decision, the Ninth Circuit stated a broad general mootness rule that contradicts the validity of sale exception, declaring that whether the appellate court "can fashion effective relief is

1    immaterial," if the purchaser bought in good faith and a stay was not obtained. *In re Filtercorp*,

2    163 F.3d at 576. The Ninth Circuit has also held that "[t]he merits of the orders approving the sale

3    are no longer in issue" because the appeal may not be pursued absent a stay. *In re Charlton*, 708

4    F.2d 1449, 1454 (9th Cir. 1983). If the reviewing court's ability to obtain relief is "immaterial,"

5    then whether overturning the Comfort Provisions would affect the validity of the Sale is irrelevant.

6    The rule is harsh and final: failure to obtain a stay mandates a finding of mootness. The Court

7    finds that the validity of sale exception is not recognized in the Ninth Circuit and Appellants'

8    appeal of the Sale Provisions are therefore dismissed as moot.

9                         **3.     State Law Exception to Mootness**

10           A few Ninth Circuit cases have recognized another narrow exception to Section 363(m)

11   mootness when the sale transaction would violate state law. *See In re Mann*, 907 F.2d 923, 926

12   (9th Cir. 1990). Appellants contend that the Comfort Provisions violate Nevada law and must be

13   stricken. First, this exception does not apply to the case at hand. As previously noted, the Comfort

14   Provisions affect the Appellants' right to a new servicing agent, their right to collect default

15   interest, and their termination rights. In both cases cited by Appellants, appeals of real property

16   sale orders were held moot. *Id.*; *In re Ewell*, 958 F.2d at 280. The *Filtercorp* court clearly stated

17   that there is only one exception to Section 363(m) mootness: "where the real property is sold to a

18   creditor who is a party to the appeal." 163 F.3d at 576. "When business assets instead of real

19   property are sold, the sale does not fall within the exception." *Id.* (internal citations omitted). This

20   case concerns the sale of "business assets" to Compass, not real property, so the exception does not

21   apply.

22           The state set aside exception should also not apply because *Mann* recognized an exception

23   where the sale itself could be set aside under state law, but Appellants here claim the underlying

24   LSAs are invalid under Nevada law. Appellants argue that the LSAs improperly deprive them of

25   their right to designate a loan servicing agent under Nevada Administrative Code 645B.073. They

26   also contend that the LSAs impinge on the Direct Lenders' ability to collect default interest.

Finally, Appellants contend USACM breached the LSAs and the Comfort Provisions denied Lenders their termination rights in event of default or breach. Appellants' arguments essentially relate to the validity of the LSAs and Surviving Section 3 Rights. The Ninth Circuit has recognized a state law set aside exception only where the *sale* itself, not the underlying assets being sold, violates state law. Therefore, these issues do not affect the mootness of this appeal under Section 363(m).

### 4. Summary of Section 363(m) Mootness

Appellants' appeal of issues surrounding the Compass Sale is moot under Section 363(m) of the Bankruptcy Code. Compass purchased in good faith and Appellants failed to obtain a stay pending appeal. The Comfort Provisions afford Compass rights and benefits that were bargained for in the sale negotiation and modification would affect the validity of the Sale. The Court cannot now undo portions of the Sale terms and strip Compass of benefits it paid for as part of the Sale. Furthermore, Compass has received transfer of the LSAs and has functioned as the loan servicer for four months, collecting and remitting payments under the LSAs. None of the exceptions identified by Appellants apply to the Compass Sale issues. As such, appeal of the Compass Sale provisions is dismissed as moot.

### C. Equitable Mootness

Debtors contend that the doctrine of equitable mootness bars Appellants from overturning an unstayed order confirming a substantially consummated, complex plan of reorganization. The Ninth Circuit BAP stated the rule: "It is now well recognized that when a stay of an order confirming a reorganization plan has not been obtained and the plan has been consummated, appeals seeking to attack the confirmed plan may be precluded." *In re Clarke*, 98 B.R. 979, 980 (9th Cir. BAP 1989). The Bankruptcy Code defines "substantial consummation" of a plan as:

> (1) a transfer of all or substantially all of the property proposed by the plan to be transferred;
> (2) as assumption by the debtor or by the successor to the debtor under the plan of the business or management of all or substantially all of the property dealt with by the plan; and
> (3) commencement or distribution under the plan.

11 U.S.C. § 1101(2).  If "many intricate and involved transactions" called for by the plan have been "so far implemented that it is impossible to fashion effective relief for all concerned," an appeal is equitably moot."  *In re Roberts Farms, Inc.*, 652 F.2d 793, 797 (9th Cir. 1981).  Additionally, an appeal is moot if an appellate court cannot afford the appellant any meaningful relief because the parties have relied on an unstayed confirmation order and made transfers to legitimate third parties. *In re Baker & Drake, Inc.*, 35 F.3d 1348, 1351 (9th Cir. 1994).  "Ultimately, the decision whether to unscramble the eggs turns on what is practical and equitable."  *Id.* at 1352.  The party asserting equitable mootness "has a heavy burden to establish that there is no effective relief remaining for the court to provide."  *In re Focus Media*, 378 F.3d 916, 922 (9th Cir. 2004).  Equitable mootness "is presumed when the reorganization plan has been substantially consummated during the pendency of the appeal."  *In re Adelphia Comm. Corp.*, 367 B.R. 84, 91 (S.D. N.Y. 2007).

Debtors seek to apply the doctrine of equitable mootness to dismiss Appellants' due process issues.  These issues largely concern the Plan's use of past and future recoupment from future loan collections by the successor servicing agent.  Debtors argue that the confirmed Plan set in motion a series of complex, interlocking, interdependent compromises among the various estates. Recoupment of money transferred by USACM to the Direct Lenders was a key aspect of these compromises.  The recouped funds are available for use by USACM under the Plan to fund claims and the USACM Trust.  Appellants ask that past recoupment be reversed and future recoupment barred, but do not address how such relief negatively would affect implementation of the other interlocking Plan compromises.  As part of the compromise, the Direct Lenders received a two year standstill on lawsuits to recover past overpayments, while the recouped PrePaid interest has been recouped to pay claims on the estate.  Appellants seek to have it both ways – they want both the moratorium on lawsuits and halted recoupment.  This result would undercut the give and take that drives the Plan compromises.

The Plan now has been substantially consummated and reversal of the Confirmation Order would seriously undercut the Plan compromises and consummated transactions implementing it. Since the Confirmation Order was entered and the Compass Sale approved, a number of transactions have occurred, including:

- Transfer of the LSAs to Compass, with Compass commencing service of the loans.

- Extensive payment and transfer of assets under the Plan, including: (a) transfer of the Prepaid Interest collections totaling $36.3 million to USACM, (b) transfer of $351,587 to USACM under the 2% Holdback Compromise, (c) payment to USACM of $2.6 million from the 2% Holdback, (d) transfer to USACM of $2.6 million from FTDF, (e) transfer of $969,000 to FDTF from USACM, and (f) transfer of $500,000 from FTDF to DTDF.  These funds have been commingled and distributed under the Plan compromise provisions.

- Creation of the USACM Trust, with a vested interest in the USACM estate.

- Distribution of all assets of the USACM estate under the Plan provisions.

- Distribution of $37 million to 950 FTDF members under the Plan.

- USACM Trust litigation against third parties, resulting in resolution of multi-million dollar inter-estate disputes.

*See* Smith Declaration.   These transactions establish that the confirmed Plan has been substantially consummated under 11 U.S.C. § 1101(2).  Numerous complex and interwoven transactions have transpired, the Compass Sale has closed, USACM is no longer permitted to service the loans, and distributions have been made.

Therefore, in this case, "the innumerable transfers legitimately effected to and among innocent third parties in the absence of a stay, and in reliance on the order of confirmation . . . plainly represent so substantial a consummation of the reorganization plan as to render the requested appellate relief impracticable." *Baker & Drake*, 35 F.3d at 1351.  Additionally, even if disgorgement could occur in isolation of other plan interests, there is not enough money in the USACM Trust to refund the Prepaid Interest recouped to date.  Approximately $36.3 million had been recouped as of the Confirmation date, but the USACM Trust had only received $23,190,258 of commingled Prepaid Interest recoupments, Compass Sale proceeds, and other USACM assets.

16

Therefore, Appellants' desired refund is not possible under the Plan.  In a similar case, a court noted, "Substantial amounts are at stake, and if the claim is ultimately anywhere close to the stipulated estimate for plan confirmation, a majority of the remaining plan disbursements are dramatically affected." *In re Gotcha Int'l, L.P.*, 311 B.R. 250, 255-56 (Bankr. 9th Cir. 2004). Additionally, LPG is not entitled to disparate treatment under the Plan.  All holders in a single class must receive the same treatment and any modified plan must meet that test.  11 U.S.C. § 1123(a)(4).

The Plan has been substantially consummated.  As such, the doctrine of equitable mootness bars Appellants from unwinding isolated transactions to receive special treatment. *See In re Adelphia*, 367 B.R. at 94-99.  Such a course likely would undermine the interrelated compromises that comprise the Plan and jeopardize the viability of the USACM Trust.  Thus, Appellants' appeal of the due process issues are dismissed as moot.

## II.   **The Merits**

Although the Court has dismissed the appeal as moot, it proceeds to analyze the substantive arguments raised on the merits.  As discussed below, even if the appeal were not dismissed as moot, the Court nevertheless would uphold the Plan as confirmed by the Bankruptcy Court.

### A.   **Due Process Issues**

Appellants contend the Plan violates due process because it takes Appellants' property in the form of post-petition payments by borrowers without an adversary proceeding.  Appellants contend USACM has no property interest or claim to the payments borrowers make other than to subtract its servicing fee.  Consequently, Appellants contend the bulk of the post-petition payments are Appellants' property that merely flows through USACM's hands.  However, the Plan permits Debtors to keep the payments to recoup Prepaid Interest paid to Direct Lenders.  Appellants contend this Plan feature violates due process by taking Appellants' interest in the payments without adversary proceedings.  In conjunction with this argument, Appellants contend the "compromise" reached between Debtors and the Direct Lenders committee cannot be imposed

upon non-consenting Direct Lenders.  Additionally, Appellants argue recoupment is a defense that cannot be used offensively.  Finally, Appellants argue the Plan forecloses the setoff rights of Direct Lenders whose borrower paid off on the loan but USACM used the principal payments to cover other payments rather than pay the Direct Lenders on the satisfied loan ("Diverted Principal" claims).

As an initial matter, the proceedings below satisfied general due process standards. Appellants received notice and an opportunity to be heard by submitting written objections and arguing the objections at the plan confirmation hearing. *See Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 984 (9th Cir. 1998) (noting the hallmarks of due process to be an opportunity to be heard at a meaningful time in a meaningful manner).  In the bankruptcy context, however, the United States Court of Appeals for the Ninth Circuit has indicated that where an adversary proceeding is required, the debtor must file and serve a complaint and summons, rather than attempt to accomplish through plan confirmation what the bankruptcy rules require to be done through an adversary proceeding.  *In re Commercial W. Fin. Corp.*, 761 F.2d 1329, 1336-37 (9th Cir. 1985).  Pursuant to Federal Rule of Bankruptcy Procedure 7001(2), an adversary proceeding is required "to determine the validity, priority, or extent of a lien or other interest in property."

The two cases upon which Appellants primarily rely for their argument that adversary proceedings were required in this matter are *In re Commercial W. Fin. Corp.*, 761 F.2d 1329 (9th Cir. 1985) and *In re Golden Plan of California, Inc.*, 829 F.2d 705 (9th Cir. 1986).  In *Commercial Western*, the debtor solicited money from investors and lent that money to borrowers.  761 F.2d at 1331.  The borrowers executed promissory notes secured by deeds of trust in favor of the debtor. *Id.*  The debtor provided the investors with its own promissory notes secured by partial assignments of the borrowers' notes and deeds.  *Id.*  After the debtors filed for bankruptcy, the trustee attempted to avoid the lenders' partial interests in the notes and deeds of trust through plan confirmation rather than through adversary proceedings.  *Id.* at 1331-32.  The Ninth Circuit ruled such a maneuver was procedurally improper and that to avoid the lenders' interest in the notes and deeds,

1   the trustee was required to initiate adversary proceedings. *Id.* at 1336-38.

2       In *Golden Plan*, the debtor made real estate loans to borrowers and sold to investors whole

3   or partial assignments in the borrower's notes and trust deeds. 829 F.2d at 707. If an assigned debt

4   went into default, investors had a contractual option to receive "advances" from the debtor on the

5   defaulting borrowers' behalf paid from accounts in which investors' funds had been commingled

6   with the debtor's funds. *Id.* In exchange for making these advances, the debtor had a contractual

7   right to collect all late fees. *Id.* at 709-10. After an involuntary petition for bankruptcy was filed,

8   the trustee requested special instructions on how to handle releasing to investors the notes and trust

9   deeds. *Id.* at 707. In reviewing the bankruptcy court's categorization and treatment of classes, the

10   district court *sua sponte* ruled the "advances" were fraudulent conveyances which the trustee could

11   avoid even though the trustee had not initiated adversary proceedings or gave notice of a claim of

12   fraudulent conveyance. *Id.* at 708. The Ninth Circuit reversed, concluding the trustee had to

13   initiate adversary proceedings to litigate the investors' claimed right to the advances received from

14   the debtor. *Id.* at 711-12.

15       The present situation is distinguishable from both *Commercial Western* and *Golden Plan*.

16   Here, Debtors are not seeking to use avoidance powers through plan confirmation rather than

17   through adversary proceedings. Debtors are not seeking to draw back into the estate through plan

18   confirmation money or property currently in the Direct Lenders' possession. There is no dispute

19   the Direct Lenders had no legal or contractual right to the Prepaid Interest payments.

20   Consequently, Debtors are not attempting to determine the extent, validity, or priority of the Direct

21   Lenders' rights to the Prepaid Interest through plan confirmation because it is undisputed the Direct

22   Lenders have no such rights.

23       With respect to the post-petition payments from borrowers, the recoupment procedure in the

24   Plan is an equitable remedy.[3] *See Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1401

25

26   [3]   "Recoupment is the setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim." *In re*

19

1    (9th Cir. 1996).  Pursuant to Federal Rule of Bankruptcy Procedure 7001(7), equitable remedies

2    provided for in a Chapter 11 plan are not the subject of adversary proceedings.

3          An adversary proceeding under Rule 7001(2) also was not required for the post-petition

4    payments because the Plan does not purport to determine the validity, extent, or priority of

5    Appellants' rights to payments from borrowers on performing loans.  Debtors do not seek to

6    diminish the amount Appellants are contractually entitled to receive.  Whatever borrowers pay

7    post-petition on the loans (minus contractual servicing fees) will be credited or paid to Appellants,

8    either because Debtors already made those payments illegally in the form of Prepaid Interest or

9    because after recoupment is completed, Appellants will receive payments directly on performing

10   loans.  Consequently, the netting procedure is a treatment of claims, not a determination of the

11   validity, extent, or priority of those claims.

12         With respect to whether this claim treatment could be forced as a "compromise" on non-

13   consenting creditors, a committee is empowered to negotiate with the debtor regarding claim

14   treatment and to recommend to its members whether to approve or reject a proposed plan.  11

15   U.S.C. § 1103(c); *see also* 11 U.S.C. § 1123(b)(3)(A) (permitting a plan to provide for "the

16   settlement or adjustment of any claim or interest belonging to the debtor or to the estate").  The

17

18   _____

     *Madigan*, 270 B.R. 749, 754 (9th Cir. BAP 2001) (quotations and emphasis omitted).  Although
19   usually a creditor attempts to recoup against a debtor, a debtor may recoup from a creditor.  *In re Seko
     Inv., Inc.*, 156 F.3d 1005, 1009 (9th Cir. 1998).  Appellants contend Debtors improperly are using
20   recoupment offensively.  However, Debtors are not reaching out to require Direct Lenders to pay back
     the Prepaid Interest from their own funds.  Rather, Debtors are recouping improperly paid Prepaid
21   Interest from Appellants' claims to post-petition payments by borrowers.
           Appellants also claim their setoff rights should have been preserved.  Although 11 U.S.C. § 553
22   preserves a creditor's rights to setoff under applicable state law, setoff is permissive, not mandatory.
     *In re Cascade Roads, Inc.*, 34 F.3d 756, 763 (9th Cir. 1994).  Whether to permit setoff lies within the
23   bankruptcy court's discretion guided by "general principles of equality."  *Id.* (quotations omitted).  The
     Bankruptcy Court determined, in its discretion, that setoff would not be appropriate because it would
24   create unfair treatment as between Direct Lenders with Diverted Principal claims who had not received
     Prepaid Interest and those that both had Diverted Principal claims and had received Prepaid Interest.
25   (2:07-CV-000721-RCJ-GWF, Doc. #46, Ex. S at 21-22.)  Appellants have presented no evidence the
     Bankruptcy Court abused its discretion in denying setoff rights.
26

1   committee's approval of a particular plan does not bind non-consenting creditors to plan treatment.

2   It is the class vote to accept the plan that binds even non-consenting creditors to claim treatment.

3   11 U.S.C. § 1126, § 1141(a).  To protect non-consenting creditors, the plan can be "crammed

4   down" over their objection only if strict fairness standards are met and the plan may not be

5   imposed over the objection of an impaired class that would fare better under liquidation.  *See* 11

6   U.S.C. § 1129.

7       Here, all impaired classes which voted approved the plan, including the Direct Lender

8   class.[4]  (2:07-CV-00072-RCJ-GWF, Doc. #46, Ex. V at 8.)  Appellants have not asserted or

9   presented evidence that the fairness provisions were not met or that they would have faired better

10  under liquidation.  Consequently, the Plan provisions compromising Direct Lender claim treatment

11  are binding on Appellants regardless of whether they agreed to those compromises.  The Court

12  therefore will affirm the Bankruptcy Court's Confirmation Order and findings of fact and

13  conclusions of law regarding the due process issues.

14      **B.    The Loan Servicing Agreements**

15      Appellants[5] contend the Bankruptcy Court erred by ruling the LSAs were non-executory

16  contracts that Debtors did not have to cure before transferring to Compass.  Appellants argue the

17  LSAs are non-executory because the Direct Lenders still had material performance obligations

18  under the contracts, including paying loan servicing fees, advancing foreclosures costs, and

19  executing a power of attorney.  Debtors respond the LSAs were executory because at the time of

20  the petition, there was nothing left for Direct Lenders to do except await payment on the loans.

21      Pursuant to 11 U.S.C. § 365(a), a trustee may assume or reject an executory contract.  If the

22  debtor has defaulted on the executory contract, the trustee may not assume the contract without

23

24  _____

    4.   Some classes received no distribution under the Plan and thus were deemed to have rejected
    the Plan.  (2:07-CV-00072-RCJ-GWF, Doc. #46, Ex. V at 8.)

25

26  5.   Appellant DACA raised issues relating solely to the LSAs.  Consequently, the Court includes
    DACA in the term "Appellants" for this portion of the Opinion.

curing or providing adequate assurances of future performance.  11 U.S.C. § 365(b).  A contract is executory when "the obligations of both parties are so far unperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other."  *In re Texscan Corp.*, 976 F.2d 1269, 1272 (9th Cir. 1992) (quotation omitted).  To determine whether a contract is executory, the Court must determine whether both sides still must perform outstanding obligations at the time the petition for relief is filed.  *In re Robert L. Helms Constr. & Dev. Co., Inc.*, 139 F.3d 702, 706 (9th Cir. 1998).  An outstanding obligation may include a duty to refrain from taking certain actions.  *See In re Qintex Entm't, Inc.*, 950 F.2d 1492, 1496 (9th Cir. 1991) (stating party to licensing agreement had a duty to refrain from selling the rights to subdistribute the movies to third parties, among other obligations, in exchange for duty to give accountings and pay royalties for future sales, and these mutual obligations made the licensing agreement executory).

Pursuant to Section 5 of the LSAs, USACM was entitled to "retain" monthly servicing fees of up to three percent, late charges collected from the borrower, and default interest collected from the borrower.  (2:07-CV-00072-RCJ-GWF, Doc. #46, Ex. E, Attach. A at 4.)  Under Section 4, USACM also was entitled to foreclosure costs as follows:

> USA will assist the Lender in any necessary foreclosure proceedings to protect the Lender's interest in the note and deed of trust. . . . Upon demand by USA, Lender agrees to promptly pay, either in advance or to reimburse USA, for its pro rata portion of the out-of-pocket expenses incurred, including attorney's fees, trustee's fees and foreclosure costs.  In the event that Lender fails to pay such sums to USA upon demand or request thereof, or if USA elects to advance such sums, USA may, in its discretion, advance such fees . . . provided, however, that any fees advanced by USA shall be paid back from proceeds of the foreclosure . . . .

(*Id.*)  Through Section 11, the lender agreed that USACM would have full power and authority as attorney-in-fact for each loan.  (*Id.* at 5.)  Section 11 also required the lender to execute a power of attorney upon USACM's request.  (*Id.*)

At the time Debtors filed the petition for bankruptcy, Appellants could not evade the requirement to pay USACM servicing fees because, under the LSAs, USACM collected its fees

1   through holding back a percentage of payments USACM collected from borrowers. USACM

2   acquired its fees as the money passed through its hands from borrowers to lenders. Consequently,

3   the Direct Lenders had no opportunity to deny USACM its fees, and thus they could not materially

4   breach the LSAs by refusing to pay servicing fees. Likewise, the Direct Lenders could not breach

5   the LSAs by refusing to pay foreclosure costs because in the event of such a refusal, USACM was

6   contractually entitled to recover its costs by deducting costs from the foreclosure proceeds.

7   Further, no evidence in the record suggests any outstanding demand for payment of foreclosure

8   costs existed at the time the petition was filed.

9       Finally, executing the power of attorney is ministerial in nature, not a material obligation.

10  In the LSA, the lender appointed USACM its attorney-in-fact with respect to each loan. Executing

11  a separate power of attorney therefore was a ministerial act which was meant to confirm the parties'

12  existing relationship, not to create or alter that relationship. *See In re Columbia Gas Sys. Inc.*, 50

13  F.3d 233, 243 (3d Cir. 1995); *cf. In re Lemons & Assocs., Inc.*, 67 B.R. 198, 216 (Bankr. D. Nev.

14  1986) (finding an obligation to convey title or to surrender a promissory note upon satisfaction of

15  the underlying debt is ministerial and does not make an agreement executory). Indeed, the LSA

16  states the executed power of attorney is merely "further evidence" of USACM's status as the

17  lender's attorney-in-fact. (2:07-CV-00072-RCJ-GWF, Doc. #46, Attach. A at 5.) Additionally, no

18  evidence suggests that at the time the petition was filed, USACM had any outstanding, unfulfilled

19  requests for a Direct Lender to execute a power of attorney. Accordingly, the Court affirms the

20  Bankruptcy Court's finding that the LSAs were nonexecutory contracts.

21      **C.    The "Comfort Provisions"**

22      Appellant DACA challenges certain provisions in the confirmation order which DACA

23  refers to as the "comfort provisions." DACA contends these provisions constitute an impermissible

24  modification of the Plan after the vote and subject DACA to a compromise to which it did not

25  agree.

26          **1.    Changing the Servicing Agent/Termination Rights**

23

1    DACA's first objection revolves around certain provisions in the LSAs and in Nevada law

2    regarding when a lender may change a loan servicing agent. DACA challenges the provision in the

3    Confirmation Order which stays for thirty days the effectiveness of attempts by the lenders to

4    designate a new servicing agent in place of Compass. Debtors contend the Confirmation Order's

5    procedure for handling attempts to change the servicing agent are proper.

6          Nevada Administrative Code § 645B.073 provides:

7          if a mortgage broker acts on behalf of investors on a matter related to a mortgage
           loan, and if the beneficial interest in the loan belongs to more than one natural
8          person, the documentation of the matter must include provisions to allow the holders
           of 51 percent or a greater specified percentage of the beneficial interests of record to
9          act on behalf of all the holders of the beneficial interests of record in the event of a
           default or foreclosure for matters that require the direction or approval of the holders
10         of the beneficial interests in the loan, including, without limitation:

11              (a) The designation of the mortgage broker, servicing agent or other
                person to act on the behalf of the holders of the beneficial interests in
12              the loan; and

13              (b) The sale, encumbrance or lease of real property owned by the
                holders resulting from a foreclosure or the receipt of a deed in lieu of
14              a foreclosure.

15   Section 3 of the LSAs state that pursuant to this requirement, "if for any reason [USACM] fails to

16   act on Lender's behalf . . . then Lender may, with approval of fifty-one percent . . . act on behalf of

17   all such holders of beneficial interests. These actions may include . . . the designation of the

18   mortgage broker, servicing agent, or other person to act on behalf of the holders . . . ." (2:07-CV-

19   00160, Doc. #47, AER13.) Section 8 of the LSAs provides that a lender may terminate the

20   agreement with thirty days notice if USACM fails to perform its obligations. (*Id.* at AER14.)

21         The confirmation order provides that the LSAs are being sold "free and clear" of:

22         all monetary and non-monetary defaults and rights that purport to give to any party a
           right or option to effect any forfeiture, modification, right of first refusal, or
23         termination of the Sellers' or the Asset Purchaser's interest in, or rights under, the
           Acquired Assets, or any similar rights, based in any way on any action taken (or
24         failed to be taken) by any of the Debtors or any other matter or occurrence relating
           to the period prior to the Closing (other than any right that existed and was matured
25         and exercisable, as of the Petition Date, to effect a substitution of USACM as loan
           servicer under Section 3 of any Loan Servicing Agreement, as well as any defenses
26         of the loan servicer thereto (a "Surviving Section 3 Right")).

24

1   (2:07-CV-00160-RCJ-GWF, Doc. #56, AER1433, ¶ 14 of the confirmation order.)  Although the

2   Plan purported to make the sale to Compass "free and clear" of all claims, controversy arose over

3   whether the Direct Lenders should be able to terminate the LSAs for Debtors' pre-petition

4   breaches.  (2:07-CV-00072-RCJ-GWF, Doc. #52, Ex. 13, Attach. 1 at 110-20.)  Pursuant to a post-

5   vote compromise, Compass agreed to let the sale proceed subject to Direct Lenders being able to

6   exercise Section 3 termination rights for USACM's defaults.  (*Id.* at 271-73.)  This is referred to as

7   a "Surviving Section 3 Right" because it "survived" the free and clear sale to Compass.  However,

8   the Confirmation Order provides that any attempt to exercise the Surviving Section 3 Right and

9   designate a new servicing agent is stayed for thirty days to permit Compass an opportunity to

10  challenge the exercise of the rights by filing a motion with the Bankruptcy Court.  (2:07-CV-

11  00160-RCJ-GWF, Doc. #56, AER1433-34, ¶ 14 of the Confirmation Order.)  The Bankruptcy

12  Court retained jurisdiction to resolve such disputes.  *Id.*

13      DACA argues the LSAs improperly modify Nevada Administrative Code § 645B.073's

14  requirements, which DACA contends permits lenders to terminate a servicing agent with a 51%

15  vote for any reason.  According to DACA, because the Confirmation Order puts a thirty-day stay

16  on attempts to designate a new servicing agent, Compass has time to require lenders to sell back

17  enough of their interests to defeat a 51% vote for replacement.[6]  DACA therefore "requests that the

18  Confirmation Order be reversed to the extent that it may be interpreted as restricting or limiting any

19  right of the Direct Lenders (to the extent such a right may exist under Nevada law), to designate a

20  new servicing agent in place of Compass."  (2:07-CV-00160-RCJ-GWF, Doc. #45 at 11.)

21      The LSAs contain the terms of when a 51% majority may exercise rights to change a

22  servicer and provide that the servicer may buy out lenders.  Consequently, DACA's concerns about

23  the legitimacy or proper interpretation of these provisions is a matter of contract interpretation, not

24  _____

25      [6.]  Section 2(c)(iii) of the LSAs permits the servicing agent to pay a lender the outstanding
    balance plus all accrued interest and any prepayment fee on a loan at any time.  (2:07-CV-00160-RCJ-
26  GWF, Doc. #47, AER12.)

plan confirmation.  Further, the Court will deny DACA's request that it be relieved from the

Confirmation Order's thirty-day stay plus dispute resolution in front of the Bankruptcy Court for a

Section 3 termination.  DACA has not been deprived of termination rights under Section 3 of the

LSA, Section 8 requires a thirty day notice of termination, and the Bankruptcy Court had the

authority to retain jurisdiction to adjudicate disputes relating to pre-petition breaches by Debtors.

See 28 U.S.C. § 157, § 1334(b) (giving bankruptcy courts jurisdiction over all proceedings "arising

under title 11 or arising in or related to a case under title 11"); *In re Pegasus Gold Corp.*, 394 F.3d

1189, 1194 (9th Cir. 2005) (holding a bankruptcy court may retain post-confirmation jurisdiction

over matters which have a "close nexus" to the bankruptcy plan or proceeding).

### 2.    Compromising Default Interest

DACA next objects to provisions of the LSA which make default interest and late charges

payable to the servicing agent.  DACA argues these provisions create a conflict of interest for the

servicing agent, who has an interest in letting default interest and late charges accrue.  At

foreclosure, if the sale price is insufficient to cover both principal and late fees, the agent and

lender are placed in adverse positions, implicating the agent's fiduciary duties to the lender.

DACA objects to a provision in the Confirmation Order which states that the Direct Lenders do not

"have the right or ability to compromise, subordinate, or impair, in any respect, any rights, claims

or interests purchased by Compass from the Estates for default interest, accrued servicing fees, late

charges, success fees, or other amounts under the Loan Servicing Agreements."  (2:07-CV-00160-

RCJ-GWF, Doc. #56, AER1434, ¶ 14 of the Confirmation Order.)  DACA contends this language

interprets the LSAs in Compass' favor, even though the parties did not litigate this issue before the

Bankruptcy Court.  DACA therefore requests "the Confirmation Order should be reversed to the

extent that it may be interpreted as forbidding the Direct Lenders to exercise any right which they

may have under Nevada law to direct the servicing agent to compromise with the borrower the

amount of default interest or late charges in order to collect the loan." (2:07-CV-00160-RCJ-GWF,

Doc. #45 at 13.)

1   The potential conflict of interest between the loan servicer and the lender with which

2   DACA is concerned is a matter of contractual language within the LSAs, not language in the

3   confirmation order.  The Bankruptcy Court's confirmation order does not purport to interpret the

4   LSAs to define Compass' contractual rights, or lack thereof, to accrued but uncollected default

5   interest.  Resolution of potential, future disputes regarding Compass' rights under the LSAs are a

6   matter of contract interpretation, are not ripe in this proceeding, and do not warrant modification of

7   the Confirmation Order.  The Court therefore will deny DACA's request to modify the

8   Confirmation Order regarding accrued default interest.

9                                    **CONCLUSION**

10      IT IS THEREFORE ORDERED that Appellee-Debtors' USA Commercial Mortgage

11  Company ("USACM") and Debt Acquisition Company of American's ("DACA") Motions to

12  Dismiss as Moot the Appeal of Appellants Lenders Protection Group ("Lenders") (No. 2:07-CV-

13  0072-RCJ-GWF, #76; No. 2:07-CV-0160-RCJ-GWF, #23), and Second Motions to Dismiss the

14  Appeal as Moot (No. 2:07-CV-0072-RCJ-GWF, #79; No. 2:07-CV-0160-RCJ-GWF, #26) are

15  hereby *granted.*

16

17  DATED: *August 29, 2007*

18

19  _____          _____
    Robert C. Jones                      Philip M. Pro
20  United States District Judge         United States District Judge

21

22

23

24

25

26